STATE of Wisconsin, Plaintiff-Respondent,

v.

Donnal K. SWIFT, Defendant-Appellant.†

Court of Appeals

*No. 92-2278-CR.  Submitted on briefs January 11, 1993.—Decided January 20, 1993.*

(Also reported in — N.W.2d —.)

† Petition to review denied.

870

873

For the defendant-appellant the cause was submitted on the briefs of *Charles Bennett Vetzner,* assistant state public defender.

For the plaintiff-respondent the cause was submitted on the brief of *James E. Doyle,* attorney general, and *William C. Wolford,* assistant attorney general.

Before Cane, P.J., LaRocque and Myse, JJ.

MYSE, J. Donnal Swift appeals a portion of a judgment convicting him of six counts of securities fraud, in violation of sec. 551.41(3), Stats., five counts of embezzlement in violation of sec. 943.20(1)(b), Stats., and one count of racketeering in violation of sec. 946.83(3), Stats. Swift argues that (1) the evidence is insufficient to convict him of three counts each of securities fraud and embezzlement concerning personal income agreements he entered into with Mary Benotch, James Palmer [1] and Carol Kaiser, (2) because the evidence is sufficient to convict him of only two counts of securities fraud and not three, the evidence is insufficient to convict him of racketeering, and (3) the state illegally searched and seized bank records from Swift's personal business account. Because we conclude that the evidence sufficiently supports the securities fraud, embezzlement and racketeering convictions, and the bank records relating to the K & S Administration account were properly subpoenaed, the judgment is affirmed.

## FACTS

Because Swift appeals only a portion of his conviction, we set forth only the facts relevant to the Benotch, Palmer and Kaiser transactions. Each transaction involved monies paid to Swift under personal income agreements that were written promises to repay with interest a principal amount that Swift would invest on the parties' behalf. Swift and another individual did business as K & S Administration.

In February 1989, Benotch gave Swift checks totaling $14,992.62. Benotch testified that she assumed the

[1] James Palmer died prior to the commencement of this action.

money would be used for investments relating to high-tech office equipment, because she and Swift had discussed this investment during a previous conversation concerning a previous personal income agreement and in contemplation of the second agreement. The personal income agreement was not a personal or business loan to Swift. Benotch did not receive payments as promised.

In May 1989, Palmer entered into a $31,370.07 personal income agreement with Swift with the understanding that it would be used to purchase an annuity. Palmer's widow, Bernice, was present during the meetings between Swift and Palmer. She testified that Swift said the annuity would be purchased from American Life. The personal income agreement was not a personal or business loan to Swift. Palmer did not receive payments as promised.

In July 1989, Kaiser entered into a $22,381.98 personal income agreement with Swift with the understanding that it would be used to purchase an annuity. Kaiser testified that Swift had indicated to her that the annuity would be with Life USA, similar to other investments Swift had handled for her. The personal income agreement was not a personal or business loan to Swift. Kaiser did not receive payments as promised.

In January 1990, the Palmers stopped receiving the promised payments and contacted officer Mark Moderson of the Appleton Police Department. Based on Moderson's affidavit detailing the Palmers' statement expressing their concerns about the money they had given Swift for investment purposes, the trial court issued a subpoena to the First National Bank of Menasha. The subpoena ordered the production of "[all] records of the . . . K & S Administration . . . cash transactions and credit transactions and loan transactions and balance statements [regarding] the account of

James F. Palmer and . . . Bernice C. Palmer . . . from May 1989 to [April 1990]."

Moderson presented the subpoena to the bank and the requested records were delivered over a period of one or two months. The bank delivered additional records involving K & S Administration accounts other than the Palmers' account, including the Benotch and Kaiser accounts, during the time period specified on the subpoena. Moderson recognized that Benotch and Kaiser were also potential victims and contacted them at a later date.

Shortly thereafter, a second subpoena was issued based upon Moderson's affidavit detailing the Palmers' and Kaiser's concerns about missing investment money. The trial court issued a subpoena ordering the production of "[all] records of the . . . K & S Administration . . . cash transactions and credit transactions and loan transactions and balance statements [regarding] the account of James F. Palmer and . . . Bernice C. Palmer . . . from May 1, 1988 to May 1, 1989."

The bank again delivered the requested records over a period of time. Moderson examined the records and concluded that there were indeed other victims and eventually contacted them. As a result of the investigations, Swift was charged with multiple counts of securities fraud, embezzlement and racketeering.

At the motion to suppress the bank records, Moderson testified that he believed both subpoenas authorized him to look at all the records in the K & S Administration account, including the records that did not pertain to the Palmer transaction, even though they specifically referenced only the Palmer transaction. He also testified that he told the bank he was authorized to look at, and in fact requested, other records relating to the K & S Administration account.

877

The trial court denied Swift's motion to suppress the evidence contained in the bank records relating to the K & S Administration account. It concluded that neither the fourth amendment to the United States Constitution nor the Wisconsin Constitution provides for privacy rights in bank accounts, especially business bank accounts. The court also concluded that although the subpoenaed documents were not returned to the court, this technical violation of sec. 968.135, Stats., did not require suppression. Finally, the court concluded that the subpoenas themselves were ambiguous and Moderson's interpretation of what documents the subpoenas authorized him to examine was reasonable.

## SUFFICIENCY OF THE EVIDENCE

When reviewing the sufficiency of evidence to support a criminal conviction, the evidence is viewed most favorably to the state and in support of the conviction. *State v. Poellinger*, 153 Wis. 2d 493, 501, 451 N.W.2d 752, 755 (1990). "[A]n appellate court may not reverse a conviction unless the evidence, viewed most favorably to the state and the conviction, is so insufficient in probative value and force that it can be said as a matter of law that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt." *Id.*

One element of the offense of theft by fraud is that the defendant knowingly made false representations with the intent to defraud. *See* Wis J I—Criminal 1453. Section 551.41, Stats., makes it unlawful to defraud a person in connection with the sale of any security by making untrue statements of material fact or omitting a material fact.

Swift first contends that there was insufficient evidence to support the convictions for securities fraud

878

based upon the lack of evidence that he made any specific representations as to the type of investment that would be made with their funds. He argues that Benotch's, Palmer's and Kaiser's testimony at trial that they assumed he would use their money in a particular fashion does not establish that he knowingly made false representations to procure their money. We do not agree.

Swift had two personal income agreements with Benotch that both arose out of the same conversation. He concedes that this conversation, which involved a proposed investment in high-tech office equipment, is sufficient to support the conviction of securities fraud relating to the first personal income agreement. Benotch testified that at the time of the conversation she expected to receive additional funds that would be available for an additional investment. While Swift made no specific representations concerning how he would use the money upon the receipt of these additional funds, the only investment the parties discussed at the time of the first investment and in anticipation of the second investment involved high-tech office equipment. A reasonable jury could conclude either that Swift deliberately created the impression that the funds would be used for investments relating to high-tech office equipment or that he knowingly omitted material facts, that is, how he intended to use the money. This representation or omission was for the purpose of defrauding Benotch by deceiving her into thinking that the funds would be used for investments relating to high-tech office equipment as in previous personal income agreements.

While Swift made no specific representation of how he intended to use James Palmer's money, Bernice Palmer was present during a conversation between Swift and his associate, during which Swift advised his associate that the funds would be used to purchase an annuity

from "American." This conversation took place in circumstances where it was clear that the reference was to American Life, a life insurance company represented by Swift. A reasonable jury could conclude that Swift thereby represented to the Palmers that he would place their investment in American Life, and that he thereby knowingly misrepresented how he intended to use the money.

Swift's conversation with the Kaisers was limited to a discussion of an investment in annuities. While Swift did not identify a specific investment, Kaiser testified that Swift had indicated that the money would be used as it had in the past, which was to purchase annuities from Life USA. Because no other investments or loans were ever discussed, a reasonable jury could conclude either that Swift deliberately created the impression that the funds would be invested in an annuity or that he knowingly omitted material facts, that is, how he intended to use the money. This representation or omission was for the purpose of defrauding Kaiser by deceiving her into thinking that the funds would be invested in annuities as in previous personal income agreements.

██ Therefore, we conclude that the evidence sufficiently supports the three securities fraud convictions that Swift has challenged. We now consider Swift's contention that there is insufficient evidence to support the embezzlement convictions.

One element of embezzlement is that the defendant knowingly and intentionally used someone else's money without their consent and contrary to the defendant's authority. *See* Wis J I—Criminal 1444. To avoid conviction, not only must the defendant have permission to use the money, but the defendant must also have permission to use the money in the manner that it is used.

Swift argues that the proceeds were not misapplied because the personal income agreements contained no limitations as to how he was authorized to use the money. We do not agree. The circumstances of Swift's representations to each of the victims clearly contemplated an investment in various investment vehicles. While some investments were more specifically identified than others, in each instance the proceeds were to be applied to specific investments and not utilized by Swift as personal, unsecured loans. Benotch, Palmer and Kaiser each testified that they did not consent to Swift's use of their money as a personal or business loan, or for any purpose other than the previously discussed investments. They also testified that attempts to obtain the actual personal income agreements, promised payments and accountings of their investments from Swift were met with claims that Swift was unavailable, that the paperwork or payments were forthcoming and various excuses and subterfuge. A reasonable jury could conclude from this evidence that Swift's admitted conversion of these proceeds to his personal use was without Benotch's, Palmer's and Kaiser's consent. A reasonable jury could also infer from Swift's responses to requests for accountings and paperwork that he knew his use of the funds was unauthorized.

We therefore conclude that the evidence sufficiently supports the embezzlement convictions that Swift has challenged. Swift has challenged his racketeering conviction by contending that the evidence insufficiently supports his securities fraud convictions necessary to provide the requisite prior convictions to support the racketeering conviction. Because we have concluded that the evidence supports the three challenged securities fraud convictions, Swift's challenge to the racketeering

conviction must fail. He has been convicted of the requisite three or more securities fraud offenses. *See* Wis J I—Criminal 1883.

## SUBPOENA OF BANK RECORDS

Next, Swift contends that art. I, § 11, of the Wisconsin Constitution grants him a right to privacy in his bank accounts and that the bank records from the K & S Administration account were obtained in violation of this right. Swift concedes that *United States v. Miller*, 425 U.S. 435 (1976), holds that bank customers have no protectable interest in the privacy of bank records relating to their accounts under the fourth amendment to the United States Constitution. He argues, however, that several Wisconsin cases have assumed without deciding that the Wisconsin Constitution affords bank customers greater protection of bank records relating to their accounts. His reliance on those cases is misplaced.

The issue in *First Nat'l Bank & Trust Co. v. Notte*, 97 Wis. 2d 207, 293 N.W.2d 530 (1980), dealt with the extent of a creditor's duty to disclose to a surety facts about a debtor that the creditor knows materially increased the surety's risk. *First Nat. Bank & Trust* did not involve a subpoena of bank records. In *State v. Gilbertson*, 95 Wis. 2d 102, 288 N.W.2d 877 (Ct. App. 1980), the defendant's bank gave the state its records relating to the defendant's account without the defendant's knowledge or consent and without a search warrant or subpoena. Further, in *Gilbertson*, we refused to adopt the interpretation of art. I, § 11, that Swift urges. *Id.* at 106, 288 N.W.2d at 878-79. In *State v. Hoffman*, 106 Wis. 2d 185, 215, 316 N.W.2d 143, 160 (Ct. App. 1982), we assumed without deciding that the Wisconsin Constitution requires judicial authorization to inspect bank records as part of our analysis of a factual issue.

Here, as in *Hoffman*, the state had judicial authorization in the form of a subpoena to inspect Swift's bank records.

Further, our supreme court has recently reaffirmed its past decisions to interpret art. I, § 11, of the Wisconsin Constitution in conformity with the United States Supreme Court's interpretation of the fourth amendment. *State v. Guy*, 172 Wis. 2d 86, 492 N.W.2d 311 (1992). Therefore, we conclude that Swift's constitutional privacy interest argument must fail.

Swift next challenges the trial court's conclusion that the subpoenas were supported by probable cause. Section 968.135, Stats., which governs subpoenas for documents, provides, in part, that "upon a showing of probable cause under s. 968.12, a court shall issue a subpoena requiring the production of documents." Section 968.12(2), Stats., provides that probable cause may be shown by a sworn complaint or affidavit. Reviewing courts accord great deference to the issuing judge's determination of probable cause "and that determination will stand unless the defendant establishes that the facts are clearly insufficient to support a finding of probable cause." *State v. Higginbotham*, 162 Wis. 2d 978, 989, 471 N.W.2d 24, 29 (1991). We conclude that Swift fails to meet this burden.

Probable cause exists when the issuing judge is "apprised of sufficient facts to excite an honest belief in a reasonable mind that the objects sought are linked with the commission of a crime, and that the objects sought will be found in the place to be searched." *Id.* (Citations and quotations omitted.) The amount of evidence necessary to establish probable cause under sec.

968.12, Stats., is less than that required to support bindover for trial. *Higginbotham*, 162 Wis. 2d at 989, 471 N.W.2d at 29. The evidence need only be such that a reasonable judge can determine that "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* at 990, 471 N.W.2d at 29. (Citations and quotations omitted.)

When a judge has issued a search warrant or a subpoena for documents, it is presumed that the judge concluded probable cause existed and the absence of an oral or written declaration of that conclusion does not invalidate the warrant or subpoena. *See Frihart v. State*, 189 Wis. 622, 624–25, 208 N.W. 469, 469–70 (1926). Swift's notation that neither subpoena affirmatively states that probable cause existed is therefore immaterial.

Swift contends that statements in the affidavit supporting the first subpoena that the Palmers believed that he had defrauded them out of a large sum of money and that they were "worried" about the money were insufficient to establish probable cause to issue the subpoena. However, the affidavit also details the nature of the investment transaction that was supposed to occur, the Palmers' several failed attempts to contact Swift to find out what had happened to the money and to find out why they never got any paperwork accounting for the money, that the Palmers had not received payments as promised and describes the checks that they did receive, including the bank and account number that the check was drawn on. We conclude that the affidavit provides ample, detailed facts to support a finding of probable cause that the Palmers were fraud victims and that evidence of the fraudulent scheme was probably in the bank

records relating to the account the checks were drawn on.

The bank voluntarily surrendered records relating to all of the activity that went through the K & S Administration account, including activities related to the Kaiser and Benotch transactions. Moderson examined the records and determined that Kaiser and Benotch were probably victims of the same scheme, based upon the similarities to the Palmer records. Moderson then contacted Kaiser, who provided him with information similar to that the Palmers had provided him, except that Kaiser's dealings with Swift dated back to 1988. These facts were included in the affidavit supporting the second subpoena, and are sufficient to support a finding of probable cause.

Finally, Swift perfunctorily challenges the "execution" of the subpoenas. He argues that because the subpoenas on their faces authorized Moderson to look at only the K & S Administration account records that related to the Palmer transaction, records relating to the other transactions were obtained in violation of state and federal search and seizure law and must be suppressed. We do not agree.

Although sec. 968.135, Stats., requires a showing of probable cause under sec. 968.12, Stats., which is entitled "Search warrant," a subpoena demanding the production of documents is not equivalent to a search warrant. First, subpoenas, unlike search warrants, do not authorize the state to enter an area, search it and seize things without giving the target an opportunity to contemplate what is to be searched and seized. A subpoena for documents is a demand that the person upon whom it is served produce certain documents or types of docu-

ments. The subpoena's target has the opportunity not only to contemplate what is being demanded but also to challenge the demand in court.

Second, persons served with subpoenas may, in their discretion, produce more than what is demanded of them. In contrast, when the state executes a search warrant, the limits of what may be searched and seized as imposed by the warrant are more strictly construed. For example, if a search warrant authorized the search of an apartment in an apartment building, searching other apartments in the building would be unlawful state action. However, where, as here, the target of a subpoena for documents decides to produce not only the demanded documents but also other related documents, the law does not prevent the state from inspecting the additional documents.

Third, Moderson informing bank officials of his interpretation of what the subpoena required them to produce does not amount to unlawful state action, particularly where, as here, the interpretation was reasonable. Moderson's opinion is not a state order that the bank was required to obey; rather, the subpoena is the order that the bank was required to obey. The bank is not bound by Moderson's interpretation of what the subpoena required. It must determine for itself which documents the subpoena orders it to produce.

Because the additional bank records were not obtained by state action violating Swift's constitutional rights, Swift is not entitled to suppression of the additional bank records. *See State v. Verkuylen,* 120 Wis. 2d 59, 61, 352 N.W.2d 668, 669 (Ct. App. 1984). Because we have concluded that the bank's voluntary surrender of bank records other than those demanded on the sub-

886

poena provides no basis for suppression, we need not address whether Swift or the bank has standing to challenge the subpoenas. The judgment of conviction is affirmed.

*By the Court.*—Judgment affirmed.