In the Matter of a John Doe Proceeding
Commenced by Affidavit Dated July 25, 2001:

Custodian of Records for the Legislative
Technology Services Bureau, Petitioner,

v.

State of Wisconsin† and the Honorable Sarah B.
O'Brien, presiding, Respondents.

Supreme Court

*No. 02–3063–W. Oral argument November 4, 2003.—Decided June 9, 2004.*

2004 WI 65

(Also reported in 680 N.W.2d 792.)

† Motion for reconsideration filed.

ABRAHAMSON, C.J., concurs.

For the petitioner there were briefs by *Peter J. Dykman* and *Legislative Reference Bureau,* Madison, and *Michael L. Reig* and *Legislative Technology Services Bureau,* Madison, and oral argument by *Peter J. Dykman.*

For the respondent, State of Wisconsin, the cause was argued by *Alan Lee,* assistant attorney general, with whom on the brief was *Peggy A. Lautenschlager,* attorney general.

For the respondent, the Honorable Sarah B. O'Brien, there was a brief by *Nancy E. Wheeler* and *Knuteson, Powers & Wheeler, S.C.,* Racine, and *Robert E. Hankel* and *Robert E. Hankel, S.C.,* Racine, and oral argument by *Robert E. Hankel.*

¶ 1. PATIENCE D. ROGGENSACK, J. This appeal arises out of a John Doe investigation, pursuant to Wis. Stat. § 968.26 (2001–02),[1] of certain legislators and legislative employees for what is suspected to be criminal conduct. Before us is a writ of assistance asking that the John Doe judge's subpoena be quashed. In support of the writ, five contentions are made: (1) that the documents sought are privileged due to the interaction of Wis. Stat. § 13.96 and Wis. Stat. § 905.01; (2) that the subpoena violates Article IV, Section 16 of the Wisconsin Constitution; (3) that the subpoena violates the common law separation of powers doctrine; (4) that the subpoena violates Article IV, Section 8 of the Wisconsin Constitution; and (5) that the subpoena is overly broad and therefore unreasonable. We conclude that all of the

---

[1] All subsequent references to the Wisconsin Statutes are to the 2001–02 version unless otherwise indicated.

documents requested are not privileged; that on this record, we cannot determine how Article IV, Section 16 of the Wisconsin Constitution relates to the data sought by the subpoena duces tecum and that even when Section 16 does apply, it provides only use immunity and not secrecy for communications of government officials and employees; and that neither the separation of powers doctrine nor Article IV, Section 8 is sufficient to excuse compliance with a valid John Doe subpoena. However, because we also conclude that the subpoena is overly broad and therefore unreasonable, we grant the supervisory writ and quash the subpoena.

## I. BACKGROUND

¶ 2. This case arises out of a John Doe proceeding commenced in July of 2001 by the Dane County District Attorney to investigate the political caucuses that once existed for both parties in the Assembly and the Senate and to investigate whether the relationship of the caucuses to Wisconsin's senators and representatives, or the activities of certain legislators, contravened criminal laws. The matter currently before us is a challenge to a John Doe subpoena issued to the Legislative Technology Services Bureau (LTSB) for electronically stored communications[2] within the possession of LTSB.

¶ 3. In 1997, as a response to its increasing use of technology, the legislature enacted Wis. Stat. § 13.96, thereby creating the LTSB. The LTSB maintains legislators', constituents' and service agency e-mails; Internet web page development and access; office programs

---

[2] Throughout this opinion we will use "communications," "data" and "documents" interchangeably in reference to the electronic databank of the LTSB the subpoena seeks.

such as Word, Excel and PowerPoint; bill drafting software; geographic information systems; publishing systems supportive of Wisconsin session laws, statutes and the Wisconsin Blue Book; hunting systems support; and production of audio and video materials for distribution via the Internet. The LTSB supports approximately 900 legislative in-house computers and approximately 160 legislative notebook computers. The LTSB also maintains 54 legislative servers. Legislative documents are created on the 1,060 computers and then saved to the Y-Drives or the S-Drives on one of the LTSB's 54 legislative servers. The drives on the servers are backed up on backup tapes that are routinely made in order to preserve data, should there be an electronic failure. The data on these backup tapes include all legislative data that existed on the 54 legislative servers that support the entire legislative branch of government at the moment in time when the backup tapes were made.

¶ 4. In this action, the John Doe judge has ordered the LTSB to produce the backup tapes that were made on December 15, 2001 for all 54 servers, or in the alternative, to extract all "documents" for certain named legislators, their aides, and every person who worked in the Democratic and Republican caucuses for both the Senate and the Assembly. The subpoena duces tecum defined "document" as:

> hard copies or electronic files and e-mails, drafts, revisions, attached "post-it" notes or other supplemental material, graphic images, photographic images, disks, video recordings, tapes, or written materials regardless of how kept or denominated, and without regard to whether you consider any document to be public or private material.

215

¶ 5. Mark Wahl as director of the LTSB and custodian of its data is the person to whom the subpoena was directed, rather than the individual legislators, whose names have remained secret throughout these proceedings. It was Wahl who filed the motion to quash the subpoena. He raised claims of privilege, violations of two provisions of the Wisconsin Constitution, violation of the separation of powers doctrine and the overbroad scope of the subpoena, as defenses to the compulsion of the subpoena duces tecum. The John Doe judge denied the motion to quash; Wahl filed a petition for a supervisory writ in the court of appeals; the court of appeals certified the writ petition to us and we accepted certification.

## II. DISCUSSION

### A. Standard of Review

¶ 6. Statutory interpretation, or the application of a statute to a known set of facts, presents questions of law that we review without deference to the circuit court. *Deutsches Land, Inc. v. City of Glendale,* 225 Wis. 2d 70, 79–80, 591 N.W.2d 583 (1999). Similarly, we decide constitutional questions, both state and federal, de novo. *See State v. Doe,* 78 Wis. 2d 161, 254 N.W.2d 210 (1977).

### B. The John Doe Proceeding

¶ 7. To properly analyze the claimed defenses to and arguments in support of the subpoena, we must first discuss the John Doe proceeding itself. It is an investigation created by Wis. Stat. § 968.26, which provides in relevant part:

If a person complains to a judge that he or she has reason to believe that a crime has been committed within his or her jurisdiction, the judge shall examine the complainant under oath and any witnesses produced by him or her and may, and at the request of the district attorney shall, subpoena and examine other witnesses to ascertain whether a crime has been committed and by whom committed.

¶ 8. The purpose of a John Doe proceeding is to ascertain if a crime has been committed and who likely committed it. *State ex rel. Unnamed Person No. 1 v. State,* 2003 WI 30, ¶ 22, 260 Wis. 2d 653, 660 N.W.2d 260; *State ex. rel. Reimann v. Circuit Court for Dane County,* 214 Wis. 2d 605, 621, 571 N.W.2d 385 (1997); *Wolke v. Fleming,* 24 Wis. 2d 606, 613, 129 N.W.2d 841 (1964), *cert. denied,* 380 U.S. 912 (1965); *Wisconsin Family Counseling Servs., Inc. v. State,* 95 Wis. 2d 670, 676, 291 N.W.2d 631 (Ct. App. 1980). Though it involves the investigation of a crime, a John Doe proceeding need not be initiated on probable cause. *Wisconsin Family Counseling Servs.,* 95 Wis. 2d at 674–75. However, the complainant must have "reason to believe" a crime has been committed, and must allege "objective, factual assertions sufficient to support a reasonable belief" that a crime has been committed, though the complainant does not have to name a particular accused. *Reimann,* 214 Wis. 2d at 623–24. The result of a John Doe proceeding may be a written complaint that is subject to the test of probable cause. *Doe,* 78 Wis. 2d at 165.

██

¶ 9. We have held that witnesses in John Doe proceedings need not be apprised of the scope of the investigation. *State ex. rel. Jackson v. Coffey,* 18 Wis. 2d

529, 544, 118 N.W.2d 939 (1963). In addition, the secrecy aspect of a John Doe proceeding does not infringe upon a witness's First Amendment right of free speech, *id.* at 545–46, for the State has legitimate interests in the secrecy of the proceedings.[3] *Id.* at 546; *Wisconsin Family Counseling Servs.*, 95 Wis. 2d at 677.

¶ 10. A John Doe judge has broad, but not unlimited, powers. *State v. Washington*, 83 Wis. 2d 808, 822, 266 N.W.2d 597 (1978) (stating that a John Doe proceeding is "an inquest for the discovery of crime in which the judge has significant powers," but a judge has "no authority to ferret out crime wherever he or she thinks it might exist"). For example, a John Doe judge does not have the power to compel self-incriminating testimony or to grant immunity. *Jackson,* 18 Wis. 2d at 533; Wis. Stat. § 972.08. On the other hand, a John Doe judge does have the power to subpoena witnesses. Wis. Stat. § 968.26; *Wisconsin Family Counseling Servs.*, 95 Wis. 2d at 675. We have held that when a judge exceeds his or her powers, it is an erroneous exercise of discretion. *Washington,* 83 Wis. 2d at 823–24; *Jackson,* 18

---

[3] The reasons supporting secrecy of the proceedings are: to keep a John Doe target from fleeing; to prevent potential defendants from collecting perjured testimony for trial; to prevent attempts to thwart the investigation, tamper with potential testimony or hide evidence; to free witnesses from the threat of retaliation; and to prevent testimony that may be mistaken or untrue from becoming public. *Wisconsin Family Counseling Servs., Inc. v. State ,* 95 Wis. 2d 670, 677, 291 N.W.2d 631 (Ct. App. 1980). *See also State ex rel. Unnamed Person No. 1 v. State,* 2003 WI 30, ¶ 60, 260 Wis. 2d 653, 660 N.W.2d 260; *State v. O'Connor,* 77 Wis. 2d 261, 279, 252 N.W.2d 671 (1977).

Wis. 2d at 545. Within this framework, we begin our consideration of the parties' contentions.

## C. Statutory Privilege

¶ 11. Wahl contends that Wis. Stat. § 13.96, as it interacts with Wis. Stat. § 905.01, creates a statutory privilege that, while not expressly stated, is implicit in LTSB's obligation to treat all information within its possession as confidential. Therefore, as the legal custodian of the information stored by the LTSB, he is not required to comply with the subpoena.[4] The State[5] contends that the confidentiality provision of § 13.96 prevents voluntary disclosure to one who does not have proper authorization to receive the stored data, but that it is insufficient to excuse noncompliance with a valid John Doe subpoena. We agree with the State.

¶ 12. When we are presented with a question of statutory interpretation, we attempt to ascertain and give effect to the meaning of the statute. *State ex rel. Kalal v. Circuit Court for Dane County,* 2004 WI 58, ¶ 44, 271 Wis. 2d 633, 681 N.W.2d 110. We begin with the words chosen by the legislature, giving them their

---

[4] In this argument, Wahl contends that while he is privileged from producing the data requested, the legislators who created or received the data may not be. However, in other arguments, for example, the argument under Wisconsin Constitution Article IV, Section 16, he takes the opposite approach and asks us to permit him to raise any defense to production that a legislator could raise.

[5] Both the State and the John Doe judge are parties to this appeal. However, since they are united in interest, we will collectively refer to them as "the State," unless the context requires otherwise.

plain and ordinary meanings. *Id.,* ¶ 45. This is our initial focus, because as we have explained, "We assume that the legislature's intent is expressed in the statutory language." *Id.,* ¶ 44. We are aided in ascertaining the meaning of the statute by the statutory context in which words are placed. *Id.,* ¶ 46. If the statute's meaning is clear on its face, we need go no further; we simply apply it. *Id.,* ¶ 45. However, if the statutory language is capable of being understood by reasonably well-informed persons in two or more ways, then it is ambiguous. *Bruno v. Milwaukee County,* 2003 WI 28, ¶ 19, 260 Wis. 2d 633, 660 N.W.2d 656. If the statutory language is ambiguous, we may consult extrinsic sources to ascertain legislative intent. *Stockbridge School Dist. v. Department of Pub. Instruction Sch. Dist. Boundary Appeal Bd.,* 202 Wis. 2d 214, 223, 550 N.W.2d 96 (1996). Here, both positions presented are reasonable interpretations of Wis. Stat. § 13.96, because "confidential" data may, or may not, be privileged, depending on the circumstances surrounding the data and the type of request made.

¶ 13.　Wisconsin Stat. § 13.96 was created by 1997 Wis. Act 27, § 18m as a response to the legislature's ever-increasing reliance on computer-assisted communications. The LTSB serves legislators who belong to all political parties, and it warehouses data that the recipients and creators may deem confidential. Section 13.96 provides in relevant part:

> The legislative technology services bureau shall be strictly nonpartisan and shall at all times observe the confidential nature of the data and information originated, maintained or processed by electronic equipment supported by it.

Wahl relies on the § 13.96 mandate of confidentiality as

a connection to Wis. Stat. § 905.01, which addresses privileges. He asserts this mandate creates an "implicit" statutory privilege. Section 905.01 provides:

> Except as provided by or inherent or implicit in statute or in rules adopted by the supreme court or required by the constitution of the United States or Wisconsin, no person has a privilege to:
>
> (1) Refuse to be a witness; or
>
> (2) Refuse to disclose any matter; or
>
> (3) Refuse to produce any object or writing; or
>
> (4) Prevent another from being a witness or disclosing any matter or producing any object or writing.

¶ 14. However, just because data is to be kept confidential, it does not necessarily follow that Wahl has a legal privilege not to produce it. The concepts of "confidential" and "legal privilege" are very different.

¶ 15. "Confidential" data is that which is "meant to be kept secret." *Black's Law Dictionary* 294 (7th ed. 1999). Legal privilege is a broader concept. It includes having the legal right not to provide certain data when faced with a valid subpoena.[6] *Burnett v. Alt,* 224 Wis. 2d 72, 85, 589 N.W.2d 21 (1999). As we have held previously, not all confidential data is that over which the custodian or owner may assert a privilege. *See Davison v. St. Paul Fire & Marine Ins. Co.,* 75 Wis. 2d 190, 199, 248 N.W.2d 433 (1977) (concluding that a provision of the Wisconsin Administrative Code, then

---

[6] Privilege is defined as, "[A] special legal right, exemption, or immunity granted to a person or class of persons; an exception to a duty." *Black's Law Dictionary* 1215 (7th ed. 1999).

§ H24.04(1)(n)2., which requires certain reports to be prepared in a manner that keeps the names of the patients and physicians confidential, creates no privilege to refrain from producing the reports); *see also* Wis. Stat. § 102.33(2)(b)4 (authorizing the release of otherwise confidential worker compensation records in compliance with a valid subpoena).

¶ 16. Additionally, privileges are the exception and not the rule; therefore, they are narrowly construed. *Burnett,* 224 Wis. 2d at 85. To accord a privilege here would simply delay the provision of communications that Wahl concedes legislators would likely have to provide if individual subpoenas had been served on them.[7]

¶ 17. Furthermore, it is a "well-accepted legal principle, a fundamental tenet of our modern legal system, . . . that the public has a right to every person's evidence except for those persons protected by a constitutional, common-law, or statutory privilege." *State v. Gilbert,* 109 Wis. 2d 501, 505, 326 N.W.2d 744 (1982). *See United States v. Nixon,* 418 U.S. 683, 709 (1974). Wisconsin Stat. § 905.01 reaffirms this fundamental legal principle, since it states that testimony and production of things requested is the general rule and provides exceptions only in very limited circumstances, as we have explained in *Gilbert. See Gilbert,* 109 Wis. 2d at 508. Furthermore, we agree with the reasoning stated in *Nixon* that "these exceptions . . . are not

---

[7] As we noted earlier (¶ 11 n.4), Wahl's position about whether he would be privileged to refuse to provide the data if he was permitted to raise all defenses a legislator could raise is not entirely consistent.

lightly created nor expansively construed, for they are in derogation of the search for truth." *Nixon*, 418 U.S. at 710. Accordingly, we conclude that the confidentiality requirement of Wis. Stat. § 13.96 does not create a privilege for Wahl to refuse to comply with the subpoena duces tecum of the John Doe judge.

### D. Wisconsin Constitutional Claims

#### 1. Article IV, Section 16

¶ 18. Wahl also contends that he is excused from complying with the subpoena because Article IV, Section 16 of the Wisconsin Constitution provides that "[n]o member of the legislature shall be liable in any civil action, or criminal prosecution whatever, for words spoken in debate." It is Wahl's position that according to *State v. Beno,* 116 Wis. 2d 122, 341 N.W.2d 668 (1984), he is entitled to raise Section 16 as a defense to the subpoena, even though the communications are not his, because he is the agent of the legislators who could raise that defense. On the other hand, the State asserts that the John Doe proceeding is an investigation of alleged criminal activity that is not closely related to the purpose for which Section 16 was enacted; therefore, Section 16 is no defense.

¶ 19. For the purpose of our discussion, we shall assume that Wahl could argue correctly that he can assert any defense that might be available to a legislator under Article IV, Section 16. However, given the state of the record before us, we cannot determine whether constitutionally permissible criminal charges are under investigation in the John Doe proceeding or whether the allegations are intertwined with duties the legislators were elected to perform. Accordingly, we

cannot determine how Section 16 relates to the subpoena duces tecum. Furthermore, we conclude that even when Section 16 does apply, it provides only use immunity, *i.e.,* immunity from prosecution based on use of the communications, and not secrecy, for communications of government officials and employees.

¶ 20. Section 16 is one of several provisions in Wisconsin's constitution that protects the independent functioning of the legislative branch. It ensures that legislators are not distracted from nor hindered by other overly aggressive branches of government or by private litigants, as they perform the tasks for which they were elected. *Beno,* 116 Wis. 2d at 142. Indeed, we have recognized that calling legislators into court to defend actions they have taken in the course of their official duties could impede their legislative functions. *Id.* Furthermore, Article IV, Section 16's immunity, where it does exist, is not grounded solely in words spoken on the floor of the Assembly or the Senate. Rather, Section 16 reaches "matters that are an integral part of the processes by which members of the legislature participate with respect to the consideration of proposed legislation or with respect to other matters which are within the regular course of the legislative process." *Id.* at 143–44.

¶ 21. Article IV, Section 16 protects "the legislator not only from adverse judgments but also from questioning in a judicial proceeding." *Id.* at 142. However, as we have explained before:

> The constitution literally protects the member from liability for "words spoken in debate." The clause thus focuses upon matters occurring in legislative deliberations. ... The principle accorded legislators by [S]ec-

tion 16 exists only to the extent necessary for the adequate functioning of the state legislative body.

*Id.* Notwithstanding these substantial protections, Section 16 does not endow a legislator with "unlimited absolute personal immunity from substantive liability or from any obligation to testify in a judicial proceeding." *Id.* at 143. For example, Section 16 may not always provide a safe haven for a legislator who has committed a criminal or an unconstitutional act, even if done during the course of his official duties. *Id.* at 143 n.6.

¶ 22. As set forth above, our past examinations of Section 16 focused on use, or potential use, of constitutionally protected communications. However, Wahl seems to argue that Section 16's protections go beyond prohibiting use and also create a privilege to prevent disclosure. Wahl develops no legal argument to support that contention. The only case he cites in regard to Section 16 is *Beno.* But as we have explained, *Beno* concludes that the purpose of Section 16 is to limit the use that may be made of "words spoken in debate." It grants immunity for those tasks undertaken in fulfillment of the legislator's constitutional functions so as not to chill the legislator's efforts on behalf of the electorate. *Id.* at 142. However, *Beno* does not address attempts to keep legislative communications secret.

¶ 23. Because Wisconsin has a long history of open government that is now provided by statute as well as case law, Wis. Stat. §§ 19.31 to 19.39; *Linzmeyer v. Forcey,* 2002 WI 84, 254 Wis. 2d 306, 646 N.W.2d 811, and because we choose not to develop this argument for Wahl, *Truttschel v. Martin,* 208 Wis. 2d 361, 560 N.W.2d 315 (Ct. App. 1997), we conclude that in this case, if it is later determined that Article IV, Section 16 applies to communications within the possession of the LTSB, it

provides only use immunity, not a right to keep all legislative communications secret.[8]

E. Separation of Powers and Article IV, Section 8

¶ 24. Wahl makes two separation of powers arguments that we consider together. First, he asserts that the subpoena intrudes into a "core zone" of legislative power thereby violating an area constitutionally reserved exclusively to the legislature contrary to the separation of powers doctrine. Second, he contends that Wis. Stat. § 13.96 is an Article IV, Section 8 "rule of proceeding" that may be interpreted only by the legislature. The State counters that it is the prerogative of the executive branch to investigate crime and assure the faithful execution of the laws, which is the object of all aspects of the John Doe proceeding. It also asserts that § 13.96 is not a rule of proceeding, but even if it were, courts may interpret it as not precluding executive inquiry into potential criminal acts of the legislature.

¶ 25. Separation of powers is a foundational principle of our tri-partite system of government, wherein each branch has equal power and a region of independent authority. *Washington*, 83 Wis. 2d at 825–26. *See also Baker v. Carr*, 369 U.S. 186, 210 (1962). However, there are many areas of shared power. *Guzman v. St. Francis Hospital, Inc.*, 2001 WI App 21, ¶ 13, 240 Wis. 2d 559, 623 N.W.2d 776. When an issue exclusively committed to the legislative branch is brought before the courts, it is often described as a "political question"

---

[8] We point out, however, that our conclusion in this regard should not be read to mean that there is no privilege that a legislator could ever raise to prevent disclosure of a particular communication now existing on the backup tapes.

that is non-justiciable. *Vincent v. Voight,* 2000 WI 93, ¶ 192, 236 Wis. 2d 588, 614 N.W.2d 388 (Sykes, J., concurring in part; dissenting in part); *see also Baker,* 369 U.S. at 210–11.

¶ 26. The LTSB has not demonstrated why the use of the data it has collected cannot be shared with the executive branch when potentially criminal conduct is at issue. The subpoena is not attempting to change the way in which the legislature functions, but rather attempting to gather information to investigate the commission of a crime. If all of the documents maintained by LTSB were out-of-bounds to such an investigation, the legislature would have effectively immunized its members and employees from criminal prosecution and in so doing usurped the role of the executive branch in assuring the faithful execution of the laws and the prosecution of crime. And finally, all of the information sought concerns past communications. It does not concern present or future communications within the legislature.

¶ 27. A related question is presented by the LTSB's argument that only the legislature can determine if the subpoena is enforceable because Wis. Stat. § 13.96 is a "rule of proceeding." Article IV, Section 8 of the Wisconsin Constitution provides that "[e]ach house may determine the rules of its own proceedings . . . ." The LTSB cites this section of the constitution as a "textually demonstrable constitutional commitment" that the question of the subpoena's enforceability is a non-justiciable political question.[9]

_____

[9] The criteria that generally are described as relating to a separation of powers argument based on the contention that the issue is a political question are:

¶ 28. Courts generally are unwilling to decide whether the legislature adhered to its own rules governing how it operates. *State ex rel. La Follette v. Stitt,* 114 Wis. 2d 358, 365, 338 N.W.2d 684 (1983). The rationale for this judicial reluctance is that a legislative failure to follow the legislature's procedural rules is equivalent to an ad hoc repeal of such rules, which the legislature is free to do at any time. *Id.*

¶ 29. At its core, the LTSB's argument depends upon our conclusion that Wis. Stat. § 13.96 is a "rule of proceeding" within the meaning of Article IV, Section 8 of the Wisconsin Constitution. Therefore, we may exercise our jurisdiction to decide whether § 13.96 is a "rule of proceeding" because that issue presents as a question of constitutional interpretation. *State ex rel. Elfers v. Olson,* 26 Wis. 2d 422, 426, 132 N.W.2d 526 (1965); *see also Yellin v. United States,* 374 U.S. 109, 114 (1963).

¶ 30. We note that Wis. Stat. § 13.96 has nothing to do with the process the legislature uses to propose or pass legislation or how it determines the qualifications of its members. It simply provides for assistance with electronic data and for an electronic storage closet for

a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving [the issue]; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker v. Carr,* 369 U.S. 186, 217 (1962).

communications created or received by legislators and other employees of the legislature. Furthermore, the legislative history of § 13.96 shows that the LTSB was created to relieve the Legislative Reference Bureau of performing such technology-centered support duties.[10] *See* 1997 Wis. Act 27, § 18; *Cf.* Wis. Stat. § 13.92(1)(d) (1996–97) and § 13.92(1) (1997–98).

¶ 31. Moreover, the subpoena seeks information in the course of an investigation into potentially criminal conduct, a function of the executive branch. And finally, Wis. Stat. § 13.96 is not necessarily in conflict with a John Doe judge's statutory authority to investigate whether a crime has been committed. Provision of the communications requested can be accomplished in a manner that continues their confidential nature until the legislator or legislative employee can be heard by a court on the merits of any claim of privilege for individual communications. Accordingly, we conclude that neither the separation of powers nor Article IV, Section 8 provides an absolute defense to the compulsion of a John Doe subpoena. We do not address whether privilege may lie for any individual communication because that question is not before us, as we have no way of knowing what the tapes may contain.

F. Claim of Overbroad Subpoena

¶ 32. We now turn to the scope of the subpoena to the LTSB. The subpoena, as modified by the order of November 4, 2002, requested "all digital computer information or data maintained by" the LTSB, including, but not limited to, the contents of all electronic

[10] The LTSB was formerly known as the Wisconsin Integrated Legislative Information System (WILIS).

mail boxes (in box, sent items, deleted items), electronic calendars, contents of the recycle bin, contents of temporary Internet files folder, image files (such as *.jpg files), and other file documents (such as *.wpd and *.doc files), stored by or on behalf of certain named elected officials, any person who had ever been employed in their offices, as well as anyone who had ever been employed in the legislative caucuses for both parties or, in the alternative, the backup tapes from December 15, 2001, for the entire legislative branch of government. The subpoena contained no specificity in regard to subject matter or limitation as to the dates or periods of time for which the communications were sought.

¶ 33. The John Doe judge ordered Wahl, as custodian of the records at the LTSB, to produce the communications contained on backup tapes as of December 15, 2001.[11] These backup tapes contain all the data stored on computers in the legislature on December 15, 2001, for all elected officials and other persons who work in the legislature. This data, the LTSB tells us, goes back to at least 1994 and some of it may have originated in the 1970s. It is undisputed that the requested backup tapes are the equivalent of hundreds of millions of printed pages.

¶ 34. When we review a John Doe subpoena, a foundational issue may be constitutional in nature. For example, does the issuance of a subpoena in a John Doe proceeding, the sole purpose of such proceeding being to investigate alleged criminal activity, have the potential to affect Fourth Amendment rights? The issue of whether the subpoena is overbroad and oppressive, and thus unreasonable, was raised by Wahl. This is a Fourth

---

[11] Wahl has stored the backup tapes in a lock-box.

Amendment concern. *Hale v. Henkel,* 201 U.S. 43, 71 (1906) (noting that a subpoena duces tecum may implicate Fourth Amendment rights).

### 1. Fourth Amendment principles

¶ 35. The Fourth Amendment, made applicable to the states through the Fourteenth Amendment, provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Constitution, Amend. IV; *see Mapp v. Ohio,* 367 U.S. 643, 655 (1961). Fourth Amendment jurisprudence expanded significantly in the latter part of the twentieth century, as law enforcement undertook the investigation of sophisticated crimes perpetrated by technologically savvy criminals who use electronic communications and advanced technology. *See, e.g.,* Paul Taylor, *The Scope of Government Access to Copies of Electronic Communications Stored with Internet Service Providers: A Review of Legal Standards,* 6 J. Tech. L. & Pol'y 109 (Fall 2001) [hereinafter *A Review of Legal Standards*]; Hon. Robert H. Bohn, Jr. and Lynn S. Muster, *The Dawn of the Computer Age: How the Fourth Amendment Applies to Warrant Searches and Seizures of Electronically Stored Information,* 8 Suffolk J. Trial & App. Advoc. 63 (2003); Martin Marcus and Christopher Slobogin, *ABA Sets Standards for Electronic and Physical Surveillance,* 18 Crim. Just. 5 (Fall 2003). To understand where Fourth Amendment juris-

prudence stands today relative to the John Doe subpoena, we must necessarily begin at the beginning.

¶ 36. At the time the Fourth Amendment was being drafted, searches were based on warrants as a matter of course.[12] *See Boyd v. United States,* 116 U.S. 616, 625–27 (1886). The chief evil the founding fathers sought to eliminate with this amendment was a search based on a general warrant, sometimes known as a writ of assistance. *Id.* at 625. These early warrants lacked specificity and allowed government officers in the late eighteenth century to enter homes, shops, and other places, and in the event the officers encountered resistance, they could break down doors and forcibly search closed trunks and chests. *Id.* (calling writs of assistance, "the worst instrument of arbitrary power" since such writs place "the liberty of every man in the hands of every petty officer") (internal quotations omitted).

¶ 37. The Fourth Amendment, then, proscribed "unreasonable searches and seizures" not as an independent governing standard of search and seizure, but instead with reference to the illegality of general warrants.[13] *A Review of Legal Standards, supra,* at 125.

---

[12] As the Fourth Amendment plainly states, constitutionally sufficient warrants are those "particularly describing the place to be searched, and the persons or things to be seized."

[13] A leading Fourth Amendment commentator noted, "[T]he Framers did not address warrantless intrusions at all in the Fourth Amendment or in the earlier state provisions; thus, they never anticipated that 'unreasonable' might be read as a standard for warrantless intrusions." Paul Taylor, *The Scope of Government Access to Copies of Electronic Communications Stored with Internet Service Providers: A Review of Legal Standards,* 6 J. Tech. L. & Pol'y 109, 126 (Fall 2001) [hereinafter *A Review of Legal Standards*] (referring to Thomas Y. Davies, *Recovering the Original Fourth Amendment,* 98 Mich. L. Rev.

The "compulsory production of a man's private papers [which, the Court noted, was the equivalent of a search and seizure], to be used in evidence against him" was an *"unreasonable* search and seizure within the meaning of the Fourth Amendment ... " *Boyd,* 116 U.S. at 622 (emphasis in original), as it extorted from him his own private papers in order to connect him with a crime and compel him to be a witness against himself. *Id.* at 633–34.

¶ 38. While the United States Supreme Court construed the Fourth Amendment as not preventing a court from compelling documentary evidence, either through a warrant or a subpoena duces tecum, a demand for such evidence violates the Fourth Amendment's reasonableness test if it lacks "the particularity required in the description of documents." *Hale,* 201 U.S. at 77. In *Hale,* a grand jury investigating antitrust violations issued a subpoena duces tecum demanding from Hale virtually every written business document in his possession regarding the company for which he served as secretary and treasurer.[14] The Court, showing a continuing concern for process that

---

547, 552 (1999)). As our country developed and crime rose, "courts and legislatures drastically expanded the ex officio authority of the warrantless officer," *A Review of Legal Standards, supra,* at 132, and the analysis of Fourth Amendment claims shifted from objections to general warrants to objections to unreasonable warrantless searches. *See id.*

[14] The subpoena in *Hale v. Henkel* demanded:

> 1. All understandings, agreements, arrangements, or contracts ... between [the company for which Hale worked and six named companies].

> 2. All correspondence by letter or telegram between [Hale's company and the six named companies].

holds constitutional problems similar to those inherent in a general warrant, concluded that after "[a]pplying the test of reasonableness to the present case, we think the subpoena duces tecum is far too sweeping in its terms to be regarded as reasonable." *Id.* at 76. Significantly, the Court stated,

> Doubtless many, if not all, of these documents may ultimately be required, but some necessity should be shown . . . or some evidence of their materiality produced, to justify an order for the production of such a mass of papers. A general subpoena of this description is equally indefensible as a search warrant would be if couched in similar terms.

*Hale,* 201 U.S. at 77.

¶ 39. In 1967, the United States Supreme Court decided *Katz v. United States.*[15] Justice Harlan, in his concurrence in *Katz,* was the first to suggest that Fourth Amendment protections arose from a person's "reasonable expectation of privacy." *Katz v. United States,* 389 U.S. 347, 360–61 (1967) (concluding that the Fourth Amendment has a "twofold" requirement: first, that a person exhibit a subjective expectation of privacy and second, that the expectation be one that society is prepared to recognize as objectively reasonable).

---

3. All reports made or accounts rendered by [the six named companies to Hale's company].

4. Any agreements or contracts or arrangements . . . between [Hale's company and certain other companies].

5. All letters received by [Hale's company] since the date of its organization from thirteen other companies . . . and also copies of all correspondence with such companies.

*Hale v. Henkel,* 201 U.S. 43, 44–45 (1906).
[15] 389 U.S. 347 (1967).

¶ 40. While private citizens presume they have reasonable expectations of privacy in many areas of their lives, the question that eventually arose was whether citizens who work for the government have similar expectations in their work places so that their Fourth Amendment rights should be protected there as well. In *O'Connor v. Ortega,* 480 U.S. 709 (1987), the Supreme Court recognized that public employees have reasonable expectations of privacy in their offices at work. The Court stated that the expectation of privacy in "one's place of work is based upon societal expectations that have deep roots in the history of the [Fourth] Amendment" and that people "do not lose Fourth Amendment rights merely because they work for the government instead of a private employer." *Id.* at 716–17 (citation omitted).

¶ 41. The Supreme Court repeatedly has explained that elected officials do not park their constitutional rights at the door when they assume public office. *Bond v. Floyd,* 385 U.S. 116 (1966) (concluding that the Georgia legislature could not prevent an elected official from taking his seat in the legislature because his expression of his anti-war sentiments was protected by the First Amendment); *see also Chandler v. Miller,* 520 U.S. 305, 313 (1997) (concluding that a Georgia statute that required candidates for public office, including incumbents, to submit to a drug test is an unreasonable search under the Fourth Amendment because it was not based on an "individualized suspicion of wrongdoing"); and *Republican Party of Minnesota v. White,* 536 U.S. 765, 788 (2002) (overturning a restriction on the speech of candidates for office, including incumbents, because the law violates the First Amendment).

¶ 42. With these concepts in mind, we turn now to the specifics of this case to determine if the legislators

and their employees have a reasonable expectation of privacy in the data on the backup tapes at the LTSB. If there is such a reasonable expectation, we must then determine whether the John Doe subpoena is overly broad, in violation of the Fourth Amendment's requirement of specificity.

### 2. The subpoena to Wahl

¶ 43. Using Justice Harlan's two-step Fourth Amendment analysis, we conclude that there is a reasonable expectation of privacy in the data stored on the backup tapes, and that the August 14, 2002, John Doe judge's subpoena duces tecum, as modified by the subsequent order, is overbroad. Therefore, we also conclude that execution of the subpoena duces tecum, as modified, would constitute an unreasonable search and seizure.

¶ 44. The first part of the two-step reasonableness test is to assess the actual, subjective expectation of privacy. *Katz*, 389 U.S. at 361. The LTSB is a nonpartisan bureau designed to serve the entire legislature. The statute that created the LTSB requires that it "shall at all times observe the confidential nature of the data and information originated, maintained or processed by electronic equipment supported by it." Wis. Stat. § 13.96. The legislature, in creating the LTSB, expressed its belief that it was establishing a confidential warehouse for its data storage.

¶ 45. The State maintains that the records sought are records of public officials affected by Wis. Stat. § 19.32(2), which provides that at least some of the materials sought are public records and, as such, are

presumed to be available for inspection. *See Linzmeyer,* 254 Wis. 2d 306, ¶ 15. However, not everything a public official creates is a public record, *see State v. Panknin,* 217 Wis. 2d 200, 209–10, 579 N.W.2d 52 (Ct. App. 1998) (concluding that personal notes of a sentencing judge are not public records), and we have not been apprised of the nature of each document stored on the backup tapes. Therefore, the fact that there may be some public records on the backup tapes does not undermine the LTSB's assertion that the public officials to whom the data belong have a subjective expectation of privacy in the data when it is stored by the LTSB. Stated another way, that most, or even all, of the data on the backup tapes may be obtainable through a public records request made directly to legislators, does not remove the reasonable expectation of privacy legislators have when the data is sought directly from the LTSB.

¶ 46. The more difficult question here is whether public employees' and elected officials' expectations of privacy in the electronically stored data they have created or received at work is one society recognizes as reasonable. *See Katz,* 389 U.S. at 361. Not all expectations of privacy are objectively reasonable. As we have explained above, the United States Supreme Court has recognized a public employee's expectation of privacy in his office space is "reasonable." *O'Connor,* 480 U.S. at 717. That privacy expectation is equally applicable even when the work space is shared by other employees. *Mancusi v. DeForte,* 392 U.S. 364, 369 (1968) (holding a union employee who shared an office with other union employees had a privacy interest in the office).

¶ 47. Technology clearly has changed the ways in which we work and communicate with others. The federal government recognized that changing technology required changing laws, and to address those

changes, it passed the Electronic Communications Privacy Act of 1986 (ECPA). Amended as 18 U.S.C. §§ 2510–2521, 2701–2710, 3121–3126 (2001). The ECPA extended the privacy protections that have been given voice communications to electronic communications such as e-mail. *See A Review of Legal Standards, supra,* at 117 (indicating that Congress concluded that privacy "was in danger of being gradually eroded as technology advanced").[16] This is a strong expression of society's expectation of privacy in electronic communications.

¶ 48. Legislators use electronic technology to compose budgets, to prepare position papers, and to draft legislation; they communicate with each other, with their staff members and with their constituents via e-mail and instant messaging. According to the LTSB, the legislative e-mail system processes more than 60,000 transactions each day.[17] Electronic assists to communication is the way in which the legislature does its work, and all of the data created is stored on the backup tapes at the LTSB.

¶ 49. These circumstances—the way in which the legislature now does business; that the LTSB was created to serve legislators on "both sides of the aisle;"

---

[16] Taylor also noted that Congress wanted to encourage the development and proliferation of new communications technology, but knew that in order for such development and proliferation to succeed, consumers needed to trust that their privacy was protected. *A Review of Legal Standards, supra,* at 126.

[17] Online petitions and e-mail to legislators are what at least one commentator has described as "the Internet-age equivalents of traditional techniques like direct mail and paper petitions." National Public Radio, *Political Activists Turn to the Web* (November 7, 2003), at www.npr.org/display_pages/features/feature_1495180.html.

and the statutory directive of Wis. Stat. § 13.96 that requires that all data stored by the LTSB shall be kept confidential—support an objectively reasonable expectation of privacy by legislators in the data on the backup tapes. Therefore, we conclude that society has recognized a reasonable expectation of privacy in the electronically stored information on the backup tapes. Accordingly, we must determine if the subpoena issued by the John Doe judge is overbroad.

¶ 50. When we examine whether the Fourth Amendment was violated, we determine whether the government intrusion was reasonable. *O'Connor,* 480 U.S. at 732 (Scalia, J., concurring). Overly broad subpoenas typically are held unreasonable in that their lack of specificity allows the government to go on an indiscriminate fishing expedition, similar to that provided by a general warrant. *Marron v. United States,* 275 U.S. 192, 196 (1927); *Boyd,* 116 U.S. at 625–26. As the United States Supreme Court has explained, a subpoena is "equally [as] indefensible as a search warrant would be if couched in similar [general] terms." *Hale,* 201 U.S. at 77.

¶ 51. Here, the subpoena requested all of the data from the computer system of an entire branch of state government in order to investigate whether a crime has been committed. It did not specify the topics or the types of documents in which evidence of a crime might be found.[18] The subpoena also did not specify any time period for which it sought records. Some of the records on the backup tapes go back to the 1970s. An open-

---

[18] Because the records sought are computer records, a key word search would not have been too difficult to incorporate into the subpoena. However, while a key word search may have been helpful, the requirements set out in ¶¶ 53–55 below are also necessary to a valid subpoena.

ended time span during which the records were produced or received is unacceptable. Accordingly, the overly broad demand of the subpoena duces tecum issued here cannot pass Fourth Amendment muster, *see, e.g., Hale,* 201 U.S. at 76–77, and therefore, it must be quashed.

¶ 52. However, we do not conclude that all documents the John Doe judge seeks in order to investigate whether a crime has been committed are inaccessible. We do, however, require more than a generalized demand for those documents. Because it is clear that another subpoena likely will issue, and because the record before us contains neither the John Doe petition used to initiate the John Doe proceeding nor the affidavit or other showing the district attorney made to obtain the subpoena, we find it necessary to summarize the requirements of the district attorney before any further subpoena is issued. In so doing, we point out that it is the district attorney's burden to provide support to the John Doe judge for a constitutionally sufficient subpoena, as he is the party who commenced the proceeding and sought the subpoena. *See Reimann,* 214 Wis. 2d at 624–25.

3. John Doe subpoena standard

¶ 53. The subpoena power of a John Doe judge is set forth in Wis. Stat. § 968.26. It provides in relevant part:

[T]he judge . . . at the request of the district attorney shall, subpoena and examine other witnesses to ascertain whether a crime has been committed and by whom committed. . . . A court, on the motion of a district

attorney, may compel a person to testify or produce evidence under s. 972.08(1),[19] . . . subject to the restrictions under s. 972.085.

Section 968.26 generally applies to the acts of a judge who conducts a John Doe proceeding. The provision relative to subpoenaing witnesses by a judge does not mention the production of documents. However, the last sentence of § 968.26, which applies to a court, not to a judge, does address the production of documents to which the immunity afforded under Wis. Stat. § 972.08(1) attaches. The division of responsibility between a judge and a court in these two provisions is consistent with a John Doe judge's inability to grant the immunity, *see Jackson,* 18 Wis. 2d at 533, that § 972.08(1) requires. However, Wahl has not argued to us that the John Doe judge was without authority to issue a subpoena duces tecum and that such a subpoena must be issued by a court. Therefore, we do not decide whether the subpoena is void because it exceeds the authority of a John Doe judge, if the Hon. Sarah O'Brien issued the subpoena duces tecum in that capacity. Instead, because a John Doe proceeding is a criminal investigative tool, *Unnamed Person No. 1,* 260 Wis. 2d 653, ¶ 22, we turn to Wis. Stat. § 968.135 which describes the quantum of proof required to issue a subpoena duces tecum in a criminal investigation.

¶ 54. Wisconsin Stat. § 968.135 provides in relevant part:

---

[19] Wis. Stat. § 972.08(1) provides immunity from criminal prosecution based on the self-incriminating nature of the records that one is compelled to produce, thereby affording protection for Fifth Amendment rights.

Upon the request of the . . . district attorney and upon a showing of probable cause under s. 968.12, a court shall issue a subpoena requiring the production of documents, as specified in s. 968.13(2).

Section 968.135 refers to subpoenas duces tecum issued by a court, not by a judge. It requires probable cause to believe that the subpoena duces tecum will produce evidence of a crime. *See State v. Swift,* 173 Wis. 2d 870, 883, 496 N.W.2d 713 (Ct. App. 1993); *see also* 9 Wiseman, Chiarkas and Blinka, *Wisconsin Practice: Criminal Practice and Procedure* § 24.16 (1996) ("The probable cause necessary to obtain a subpoena for records is essentially the same as that necessary to obtain a search warrant."). Therefore, we conclude that any subsequent subpoena duces tecum issued in this proceeding, whether it is issued under Wis. Stat. §§ 968.26 or 968.135, must be supported by probable cause to believe that the documents sought will produce evidence of a crime.

■

¶ 55. Additionally, because the data sought is meant to establish criminal conduct and may be data in which a person has a reasonable expectation of privacy, there must be a particularized showing in the affidavit of the district attorney requesting a subpoena. *Cf. Washington,* 83 Wis. 2d at 842–44. In that regard, the affidavit submitted must: (1) limit the requested subpoena to the subject matter described in the John Doe petition, *Reimann,* 214 Wis. 2d at 622; (2) show that the data requested is relevant to the subject matter of the John Doe proceeding, *Washington,* 83 Wis. 2d at 843; (3) specify the data requested with reasonable particularity, *Hale,* 201 U.S. at 77; and (4) cover a reasonable period of time. *Washington,* 83 Wis. 2d at 844. Addition-

ally, all of the communications to the John Doe judge must be made a part of the record. *See id.* at 824–25.

¶ 56. We conclude by reminding all who participate in John Doe investigations that the power wielded by the government is considerable. Accordingly, there is a potential for infringing on Fourth Amendment and other constitutional rights. *Hale,* 201 U.S. at 77. Therefore, an awareness of the individual rights that may be affected is necessary as this investigation proceeds. As we explained in *State v. O'Connor:*

> The final responsibility for the proper conduct of such [John Doe] proceedings rests with the presiding judge, whose obligation it is to ensure that the considerable powers at his or her disposal are at all times exercised with due regard for the rights of the witnesses, the public, and those whose activities may be subject to investigation.

*State v. O'Connor,* 77 Wis. 2d 261, 284, 252 N.W.2d 671 (1977). *See also Washington,* 83 Wis. 2d at 824. Accordingly, we quash the subpoena and remand to the John Doe judge for proceedings consistent with this opinion.

## III. CONCLUSION

¶ 57. We conclude that all of the documents requested are not privileged; that on this record, we cannot determine how Article IV, Section 16 of the Wisconsin Constitution relates to the data sought by the subpoena duces tecum and that even when Section 16 does apply, it provides only use immunity and not secrecy for communications of government officials and employees; and that neither the separation of powers doctrine nor Article IV, Section 8 is sufficient to excuse compliance with a valid John Doe subpoena. However, because we also conclude that the subpoena is overly

broad and therefore unreasonable, we grant the supervisory writ and quash the subpoena.

*By the Court.*—The supervisory writ is granted quashing the subpoena of the John Doe judge.

¶ 58. SHIRLEY S. ABRAHAMSON, C.J. (*concurring*). I write separately. I am concerned that the majority opinion addresses many issues, but comes to few answers that will provide guidance to the litigants and the John Doe judge.

¶ 59. The opinion does conclusively decide that the subpoena is overbroad. The majority opinion discusses the Fourth Amendment at length, but this discussion is not based on any arguments briefed by the parties and is unnecessary to the holding of the case. While I join the court in its conclusion to quash the subpoena, I do not join the discussion regarding Fourth Amendment jurisprudence.

¶ 60. I also write to comment on the issue of production of electronic information. This case involves a subpoena for electronic information and raises many of the same kinds of issues that are raised in discovery of electronic information.

¶ 61. In 2004, most information is kept in digital form, and discovery, preservation, and production of electronic information is one of the leading legal issues facing not only corporate America but also government. Reform in discovery, including electronic discovery, is a priority in several jurisdictions. This court has not previously confronted the issue of discovery of electronic data.

¶ 62. Electronic discovery (or production of electronic information) poses the same problems as conventional discovery (and production) of documents, but also poses unique problems. The volume, number of

storage locations, and data volatility of electronically stored information are significantly greater than those of paper documents. In addition, electronic information contains non-traditional types of data including meta-data, system data, and "deleted" data. Furthermore, the costs of locating, reviewing, and preparing digital files for production may be much greater than in conventional discovery proceedings. These complexities can lead, as they have in the present case, to disputes about the scope of discovery (or production), the form of production, and the protection of privileged information.

¶ 63. The following are recurring themes in the literature on electronic document production: lawyers and judges must become better educated about electronic information and discovery thereof; the parties must meet, confer, and seek to identify the information management system, the people knowledgeable about the system, what information is and is not accessible, and the scope of each party's rights and responsibilities; discovery (production) requests should be as clear as possible about the data being requested; responding parties are in the best position to evaluate the procedures, methodologies, and technologies appropriate for preserving and producing their own electronic data; and trial courts may need to be more active in managing electronic discovery and production than in managing conventional discovery or production of information, especially when parties cannot agree about the scope of the request for electronic information. The literature on electronic discovery is growing both in print and on the Internet.

¶ 64. The majority opinion does not recognize the special problems in production of electronic information or give guidance to the judge or the parties about these unique issues.

¶ 65. For the reasons set forth, I write separately.