PATIENCE DRAKE ROGGENSACK, C.J.
¶ 173. (dissenting). The lead opinion errs for at least three reasons: First, the lead opinion fails to recognize that when the Superintendent of Public Instruction en *531 gages in rulemaking with the Department of Public Instruction (DPI), the Superintendent is exercising legislative authority delegated to him by the legislature under Wis. Stat. § 15.37 (2013-14),[1] not constitutional authority delegated by Article X, Section 1 of the Wisconsin Constitution. Second, the lead opinion fails to recognize the legislature's constitutional authority to control its legislative delegation exercised as rule-making by state administrative departments such as DPI.[2] Third, Act 21 has not been applied to the Superintendent in an unconstitutional manner.
¶ 174. I conclude that the legislature acted pursuant to its constitutional authority under Article IV, Section 1 and Article X, Section 1 when it enacted Act 21, which creates procedural safeguards to be employed in rulemaking by DPI and many other administrative agencies. I also conclude that Act 21 does not conflict with Thompson v. Craney, 199 Wis. 2d 674, 546 N.W.2d 123 (1996). And finally, I conclude that the plaintiffs have not proved beyond a reasonable doubt that Act 21 has been applied unconstitutionally to the Superintendent. Accordingly, I would reverse the decision of the court of appeals, and I respectfully dissent from the lead opinion.
I. BACKGROUND
¶ 175. Before us, two sections of Act 21 are challenged: Wis. Stat. § 227.135(2) and Wis. Stat. § 227.185.[3] The plaintiffs and the Superintendent[4] *532 herein claim these provisions are unconstitutional as applied to the Superintendent because they permit the Governor to reject a proposed rule or scope statement created by DPI.
f 176. The Superintendent also contends that Act 21 is an unconstitutional delegation of legislative power to the Governor because it contains neither legislative nor procedural standards for exercising that power. The Superintendent contends that Act 21 places the Governor in a superior position to the Superintendent through regulation of DPI's rulemaking in violation of Thompson.
f 177. The State contends that rulemaking is a legislative delegation to administrative agencies, and that as part of that legislative delegation, the legislature has the authority to enact procedural safeguards that apply to rulemaking. The State asserts that Act 21 is such a procedural safeguard for legislative rulemak-ing delegations. The State acknowledges that Article X, Section 1 of the Wisconsin Constitution vests supervision of public instruction in the Superintendent, as an executive function. The State also contends that Article X, Section 1 requires that the power and duties of the Superintendent are to be established by the legislature.
¶ 178. Upon the Superintendent's motion for summary judgment, the circuit court struck down Wis. Stat. § 227.135(2) and Wis. Stat. § 227.185 as uncon *533 stitutional infringements of the Superintendent's constitutional powers. The court of appeals agreed with the circuit court and affirmed. As I explain below, the lead opinion errs because it fails to analyze, and instead glosses over, foundational legal principles that underlie this case.
II. DISCUSSION
A. Standard of Review
f 179. In order to decide the claims presented, we interpret provisions of the Wisconsin Constitution, which we undertake independently of the interpretations of the court of appeals and circuit court, while benefitting from their discussions. Custodian of Records for the Legislative Tech. Servs. Bureau, 2004 WI 65, ¶ 6, 272 Wis. 2d 208, 680 N.W.2d 792. We also interpret the challenged statutes, as their meanings are important to our decision. Statutory interpretation and application present questions of law that we decide independently. State v. Hanson, 2012 WI 4, ¶ 14, 338 Wis. 2d 243, 808 N.W.2d 390.
B. Constitutional Delegations
¶ 180. The Superintendent's assertions require us to begin by ascertaining the nature and scope of two constitutional delegations under Article X, Section 1 of the Wisconsin Constitution: (1) the delegation to the Superintendent for the "supervision" of public instruction and (2) the delegation to the legislature to decide the extent of the Superintendent's "qualifications, powers, duties and compensation." We must understand both constitutional delegations to determine whether Act 21 violates the Superintendent's constitu *534 tional authority. This is so because the Superintendent obtains authority to supervise public instruction from the Constitution and from the legislature. Therefore, we must decide whether the statutes at issue in this review affect supervision that is constitutionally vested in the Superintendent or supervision that is legislatively created for the Superintendent.
f 181. When we interpret a constitutional provision, we examine the plain meaning of the words employed, the constitutional debates at the time of the enactment of the provision and the earliest interpretation after enactment as manifested in legislation. Schilling v. Crime Victims Rights Bd., 2005 WI 17, ¶ 16, 278 Wis. 2d 216, 692 N.W.2d 623 (citing Wis. Citizens Concerned for Cranes & Doves v. DNR, 2004 WI 40, ¶ 44, 270 Wis. 2d 318, 677 N.W.2d 612).
¶ 182. The constitutional delegations of authority to the Superintendent and the legislature, as first enacted, provided in relevant part:
The supervision of public instruction shall be vested in a state superintendent, and such other officers as the legislature shall direct. The state superintendent shall be chosen by the qualified electors of the state, in such manner as the legislature shall provide; his powers, duties and compensation shall be prescribed by law: Provided, That his compensation shall not exceed the sum of twelve hundred dollars annually.
Wis. Const, art. X, § 1 (1848) (emphases added).
¶ 183. In 1902, Article X, Section 1 was amended to provide in relevant part:
The supervision of public instruction shall be vested in a state superintendent and such other officers as the legislature shall direct; and their qualifications, powers, duties and compensation shall be prescribed by law.
*535 Wis. Const, art. X, § 1 (1902) (emphasis added).
¶ 184. Article X, Section 1 vests "[t]he supervision of public instruction" in the Superintendent. This constitutional delegation has not changed materially since 1848 when Article X, Section 1 was first enacted, nor has the constitutional delegation to the legislature been changed, which delegation requires the legislature to establish the powers and duties of the Superintendent through legislation.
¶ 185. "Supervision" is a key term, but it is not defined in Article X, Section 1. However, as I set forth below, examination of the meaning of "supervision" at the time of the Constitutional Conventions of 1846 and 1848 shows that "supervision," as used in Article X, Section 1, was understood as an executive function. It was to the legislature that the Constitution accorded the authority to determine what actions the Superintendent would be permitted to take ("powers"), and what obligations ("duties") the Superintendent must shoulder in regard to public education. Wis. Const, art. X, § 1. Stated otherwise, the framers of the Constitution chose no specific duties for the Superintendent in regard to "supervision of public instruction;" instead, the legislature was given authority to control the powers and duties of the Superintendent through legislation.
¶ 186. During the constitutional debates, the executive nature of the Superintendent was discussed. For example, during the Convention of 1846, Marshall M. Strong was reported to have "thought we needed [the superintendent] to travel over the state, organize the system, and awaken the people to the importance of this subject." Journal of the Convention, reprinted in The Convention of 1846, 569 (Milo M. Quaife, ed., 1919).
*536 ¶ 187. During the Convention of 1848, all writers were reported to have agreed that the "office should have nothing to do with the machinery of the school system or the management of the funds. . . . His province was to put the system in operation." Journal of the Convention, reprinted in The Attainment of Statehood, 556-57 (Milo M. Quaife, ed., 1928). Mr. Jackson is reported to have explained, "The duties of a superintendent were not of a fixed and well-known kind, like those of political officers. Public instruction was yet in its infancy, though there had been experimenting upon it for the last fifty years." Id. at 561.
¶ 188. The dictionary definition of " superintend" from Webster's An American Dictionary of the English Language (new rev. ed. 1847-50) provided:
To have or exercise the charge or oversight of; to oversee with the power of direction; to take care of with authority; as an officer superintends the building of a ship or construction of a fort.
Thompson, 199 Wis. 2d at 683. Accordingly, vesting supervision of public instruction in the Superintendent granted non-specific, executive authority to the Superintendent.
¶ 189. However, even though in neither 1848 nor 1902 was the Superintendent's constitutional authority defined, the plain meaning of Article X, Section l's delegation to the legislature to establish the Superintendent's "qualifications, powers, duties and compensation" was clearly expressed. Article X, Section 1 plainly granted the legislature control over both the power that the Superintendent could exercise and the duties that the Superintendent must undertake. Early cases support this plain meaning interpretation of the legislature's control over the Superintendent.
*537 ¶ 190. In Raymer v. Cunningham, 82 Wis. 39, 51 N.W. 1133 (1892), we reviewed a challenge to Superintendent Wells' directive to Thomas J. Cunningham, the Secretary of State, for payments of his salary, a clerk's salary and claimed travel expenses. Id. at 39-41. In 1891, the Constitution provided that the Superintendent be paid an annual salary of not more than $1,200 per year. Raymer, a citizen and taxpayer, complained that Wells had directed Cunningham to make payments in excess of $1,200, with which direction Cunningham complied. Id. at 39, 42. It was alleged that although Wells charged the state $1,000 for "clerk hire," he incurred no such expense and that Wells was paid $1,500 for traveling expenses, when he did not incur more than $800. Id. at 41-42.
¶ 191. During our discussion of the question presented, we construed the relationship of the Superintendent and the legislature. We said:
While the section of the constitution cited prohibited the legislature from increasing the compensation of that officer beyond the amount named, yet it expressly authorized them to increase his duties and enlarge his powers and responsibilities ad libitum. This authority of the legislature has been from time to time freely exercised by especially enjoining new duties and imposing new and more onerous responsibilities.
Id. at 47. We concluded that although the legislature had increased the duties of the Superintendent since 1848 when the Constitution was ratified, nevertheless, the Superintendent had no legislative delegation to audit his own expenses and he could not receive payment above the constitutional limit even when the legislature increased his duties. Id. at 52.
*538 ¶ 192. The first legislation passed after Wisconsin's Constitution was ratified that bore on Article X, Section 1 was Section 3 of the Laws of 1848. Thompson, 199 Wis. 2d 693-94. The law assigned the Superintendent:
[G]eneral supervision over public instruction in this state, and it shall be his duty to devote his whole time to the advancement of the cause of education .... To recommend the introduction and use of the most approved text books, and to secure as far as practicable uniformity in education throughout the state .... To collect such information as may be deemed important in reference to common schools in each county, town precinct and school district... to perform such other duties as the legislature or governor of this state may direct....
Id. at 694 (quoting Laws of 1848, at 128-29) (emphasis added). Therefore, since 1848, the legislature has "bylaw" set the Superintendent's powers and duties, as Article X, Section 1 clearly requires. Furthermore, in 1848, the legislature permitted the governor to direct duties that the Superintendent was obligated to undertake.
¶ 193. The 1902 amendment to Article X, Section 1 did not impart a more definite meaning to "supervision of public instruction," nor did the amendment diminish the legislature's constitutional power over the Superintendent. The scope of the Superintendent's constitutional authority remained non-specific, executive authority as it had been in 1848.
¶ 194. The first law passed after the 1902 amendment was ch. 37 of the Laws of 1903. Id. at 696-97. Section 1 of ch. 37 Laws of 1903 established qualifications for the office of the Superintendent and Section 2 imposed 14 duties on the Superintendent. *539 Briefly stated, the legislature directed the Superintendent to: ascertain conditions of Wisconsin's public schools; advise in selection of books; investigate different systems of common schools; move public sentiment to favor industrial and commercial education; formulate study for listed schools; prescribe rules for management of school libraries; examine and determine appeals referred to the Superintendent; collect and purchase maps, charts, books, etc. for use in common schools; apportion and distribute the school fund; make copies of papers deposited in his office; prepare in even numbered years reports on all common schools; supervise teachers' institutes; hold one convention annually to confer with county superintendents; and "perform all other duties imposed upon him by law." §§ 1 & 2, ch. 37, Laws of 1903.
f 195. The above referenced ch. 37 of the Laws of 1903 exemplifies the breadth of the legislature's constitutional control over the powers that the Superintendent could exercise and the duties the Superintendent was, by law, obligated to fulfill. It also shows the executive nature of the constitutional grant to the Superintendent to supervise public instruction because all legislative requirements of the Superintendent relate to public instruction, and it was the legislature, not the Superintendent, that was making the choices about what tasks would be undertaken.
¶ 196. We previously have reviewed the legislature's power in regard to a claimed conflict between a statute and Article X. In City of Manitowoc v. Town of Manitowoc Rapids, 231 Wis. 94, 285 N.W. 403 (1939), we expressed approval of the reasoning of In re Kindergarten Schools, 32 P. 422, 422 (Colo. 1893), which provided that unless "the constitution, in express terms or by necessary implication, limits it, the legis *540 lature may exercise its sovereign power in any way that, in its judgment, will best subserve the general welfare." City of Manitowoc, 231 Wis. at 98. In so stating, we rejected a challenge based on Article X, Section 3 to various statutes that provided for a statewide system of vocational schools in Wisconsin municipalities of over 5,000 inhabitants and the opportunity for free education beyond 20 years of age. Id. at 98-99.
¶ 197. In School District No. 3 of the Town of Adams v. Callahan, 237 Wis. 560, 297 N.W. 407 (1941), we reviewed a claim that the Superintendent's legislatively assigned task exceeded the legislature's power. There, we considered Wis. Stat. § 40.30(1) (1939), which provided: "The state superintendent is authorized, on his own motion, by order to attach districts with valuations of less than one hundred thousand dollars to contiguous districts." Id. at 566.
¶ 198. School District No. 3 contended that the legislature's grant of authority to the Superintendent to combine contiguous districts with valuations of less than $100,000 was unconstitutional because monetary valuation was not "germane to the purpose of the act," and the legislative delegation was outside of "matters pertaining to public instruction," which limited what power and duties the legislature could confer on the Superintendent. Id. at 566-67. We reasoned that the Superintendent acted in strict compliance with the law, Wis. Stat. § 40.30(1) (1939), and that the legislative delegation to the Superintendent was in accord with the legislature's constitutional power under Article X, Section 1. Id. at 571.
¶ 199. It also is significant that DPI was not in existence in 1848 when the Superintendent's authority to supervise public instruction was created. When the *541 Constitution was enacted, the Superintendent acted by-issuing executive orders, some of which were held unlawful because they exceeded both the legislature's grant of authority to the Superintendent and the Superintendent's constitutional authority, as we held in Raymer, supra.
¶ 200. DPI was created by the legislature in 1967.[5] In 1967, the legislature also created the "educational approval board" that was "attached to the department of public instruction under s. 15.03." Wis. Stat. § 15.375 (1967). The educational approval board consisted of "representatives of state agencies and other persons with a demonstrated interest in educational programs appointed to serve at the pleasure of the governor." Id.
¶ 201. The educational approval board was to "exercise its powers, duties and functions prescribed by law, including rule-making . . . independently of the head of the department. . . but budgeting, program co-ordination and related management functions shall be performed under the direction and supervision of the head of the department." Wis. Stat. § 15.03 (1967). Therefore, from DPI's inception, the Superintendent was granted executive management duties; however, others (members of the educational approval board) participated with DPI, independent from the Superintendent, on issues involving public instruction, including rule-making.[6]
¶ 202. It is important to recognize that DPI has no constitutional authority. See Martinez v. DILHR, *542 165 Wis. 2d 687, 698, 478 N.W.2d 582 (1992). It is simply one of many administrative departments and agencies that the legislature has created. Id. at 697.
¶ 203. By Wis. Stat. § 15.37, as enacted and then as companion statutes were amended, the legislature granted the Superintendent authority to oversee DPI and later to engage in rulemaking with DPI. However, the Superintendent did not get his powers to supervise DPI and to engage in rulemaking from the Constitution. The Superintendent obtained these powers from the legislature through statutory enactment.
¶ 204. Stated otherwise, the Superintendent's rulemaking with DPI is legislatively granted supervision of DPI, not constitutionally granted supervision of DPI. This distinction about the source of the Superintendent's powers relative to DPI is important because in order for a statute to be unconstitutional as applied, it must adversely affect a constitutional power of the Superintendent. Statutes that affect statutory powers of the Superintendent are simply statutory amendments, which the legislature is always free to enact. City of Manitowoc, 231 Wis. at 98.
¶ 205. The Attorney General also has examined the constitutional delegation to the Superintendent and has concluded that the scope of the Superintendent's authority "is placed within the discretion of the legislature by the use of the phrase in art. X, sec. 1, 'powers, duties and compensation shall be prescribed by law.' " 37 Op. Att'y. Gen. 347, 353 (1948).
¶ 206. Accordingly, I conclude that Article X, Section 1 granted the Superintendent only non-specific executive authority with regard to free public schools on a statewide basis. The Attainment of Statehood, 556-57. That is the extent of the Superintendent's constitutional powers. I also conclude that Article X, *543 Section 1 granted the legislature authority to legislate which activities (powers) the Superintendent could pursue and which obligations (duties) he was required to meet.
C. Statutory Interpretation
¶ 207. Now that I have determined the scope of the constitutional delegations to the Superintendent and to the legislature under Article X, Section 1 of the Wisconsin Constitution, the next step is to decide whether Act 21 collides in an unconstitutional way with the executive authority of the Superintendent. This requires interpretation and application of those provisions of Act 21 about which complaint has been lodged before us: Wis. Stat. § 227.135(2) and Wis. Stat. § 227.185.
1. General principles
¶ 208. DPI has no power to create a law, nor has the Superintendent. Article IV, Section 1 of the Wisconsin Constitution clearly provides: "The legislative power shall be vested in a senate and assembly." Any rulemaking authority DPI has is a delegation of power from the legislature. Martinez, 165 Wis. 2d at 698—99.
¶ 209. In Martinez, we addressed whether the legislature's delegation to the Joint Committee for Review of Administrative Rules (JCRAR) to "temporarily suspend administrative rules pending bicameral review by the legislature and presentment to the governor for veto or other action" was lawful. Id. at 691. When JCRAR notified DILHR that it was suspending part of Wis. Admin. Code § IND. 72.01(16), DILHR told Wisconsin employers to ignore JCRAR's action suspending its rule. Id. at 692-93. The Martinez litigation followed.
*544 ¶ 210. In upholding JCRAR's action, we explained that" administrative agencies are creations of the legislature and [] they can exercise only those powers granted by the legislature." Id. at 697. We also explained that "rule-making powers can be repealed by the legislature." Id. at 698. Thereafter, we concluded that DILHR's arguments lacked merit in part because "it is incumbent on the legislature, pursuant to its constitutional grant of legislative power, to maintain some legislative accountability over rule-making." Id. at 701.
¶ 211. Here, DPI engages in rulemaking to administer statutes that involve education, which have been enacted by the legislature and signed into law by the Governor. DPI cannot make rules on any subject matter it chooses. Rather, all of its rules must relate to education. For example, Wis. Admin. Code § PI 2 establishes procedures for school district boundary appeals under Wis. Stat. ch. 117. Wisconsin Admin. Code § PI 5 establishes procedures for granting high school equivalency diplomas and certificates pursuant to Wis. Stat. § 115.29(4)(a). Wisconsin Admin. Code § PI 18 establishes course requirements to meet the graduation standards outlined by the legislature in Wis. Stat. § 118.33.
¶ 212. Furthermore, "[n]o agency may promulgate a rule which conflicts with state law." Wis. Stat. § 227.10(2). It is well established precedent that "[a]n administrative rule that conflicts with an unambiguous statute exceeds the authority of the agency that promulgated it." Thomas More High Sch. v. Burmaster, 2005 WI App 204, ¶ 15, 287 Wis. 2d 220, 704 N.W.2d 349 (internal quotation marks omitted) (quoting Seider v. O'Connell, 2000 WI 76, ¶ 28, 236 Wis. 2d 211, 612 N.W.2d 659).
*545 2. Wis. Stat. § 227.135(2) and Wis. Stat. § 227.185
¶ 213. As usual when statutory interpretation is at issue, we begin with the words chosen by the legislature. Wis. Indus. Energy Grp., Inc. v. Pub. Serv. Comm'n, 2012 WI 89, ¶ 15, 342 Wis. 2d 576, 819 N.W.2d 240. If their meaning is plain, we apply that meaning and go no further. State ex rel. Kalal v. Circuit Court for Dane Cnty., 2004 WI 58, ¶ 45, 271 Wis. 2d 633, 681 N.W.2d 110.
¶ 214. Wisconsin Stat. § 227.135(2) is at the forefront of plaintiffs' challenge. It provides:
An agency that has prepared a statement of the scope of the proposed rule shall present the statement to the governor and to the individual or body with policy-making powers over the subject matter of the proposed rule for approval. The agency may not send the statement to the legislative reference bureau for publication under sub. (3) until the governor issues a written notice of approval of the statement. The individual or body with policy-making powers may not approve the statement until at least 10 days after publication of the statement under sub. (3). No state employee or official may perform any activity in connection with the drafting of a proposed rule except for an activity necessary to prepare the statement of the scope of the proposed rule until the governor and the individual or body with policy-making powers over the subject matter of the proposed rule approve the statement.
Section 227.135(2) unambiguously requires approval of proposed scope statements by both the Governor and the Superintendent, "the individual. . . with policy-making powers," when DPI is rulemaking. Wisconsin Stat. § 227.185 unambiguously requires that proposed rules be approved by the Governor before they can *546 proceed further.[7] Therefore, unless they have been proved unconstitutional beyond a reasonable doubt, they must be enforced according to the plain meaning of their terms.
¶ 215. As I explained above, administrative rule-making is undertaken to facilitate application of statutes that the legislature creates. It is the legislature that sets, by statute, the policy to be furthered in rulemaking. In addition, rulemaking is accomplished only through legislative delegation to an administrative agency or department. Martinez, 165 Wis. 2d at 698-99. The legislature controls the delegation of legislative authority that it accords to administrative agencies and departments to employ in rulemaking. Id. at 701.
¶ 216. Requiring the Superintendent to approve the scope statement of a new rule that facilitates application of statutes relating to education, clearly is within the legislature's constitutional power under Article IV, Section 1 and its authority in regard to the Superintendent under Article X, Section 1 of the Wisconsin Constitution. The lead opinion seems to agree that the legislature can require the Superintendent to approve the scope statement of proposed DPI rules.
¶ 217. However, the lead opinion concludes that Wis. Stat. § 227.135(2) and Wis. Stat. § 227.185 are unconstitutional as applied to the Superintendent be *547 cause rulemaking is a supervisory power of the Superintendent, and by granting the Governor the power to approve the scope of a rule under § 227.135(2) and proposed rules under § 227.185, the legislature has given the Governor the power to supervise public instruction.[8]
| 218. The lead opinion errs because it misper-ceives two foundational legal principles that underlie this case: (1) it fails to recognize that the legislature accorded the Superintendent the power to participate with DPI in rulemaking and (2) it fails to recognize the legislature's constitutional authority under Article IV, Section 1 of the Wisconsin Constitution to control delegations of legislative power such as occurred with DPI's rulemaking.
¶ 219. To explain further, first, it was the legislature that granted the Superintendent the authority to direct and supervise DPI, as Wis. Stat. § 15.37 very clearly provides: "There is created a department of public instruction under the direction and supervision of the state superintendent of public instruction."
¶ 220. This is a statutory grant of authority from the legislature to the Superintendent. The Superintendent did not obtain the power to direct and supervise DPI from Article X, Section 1 of the Wisconsin Constitution. He got those powers from Wis. Stat. § 15.37. Therefore, in regard to rulemaking with DPI, the Superintendent has only legislative power.
¶ 221. There was no DPI when the Superintendent of Public Instruction was created by Article X, Section 1, nor was there rulemaking. Rather, it was the legislature that set obligations for the Superintendent with regard to DPI. Stated otherwise, it was the *548 legislature that gave the Superintendent the power to direct and supervise DPI; not the Constitution. Compare Wis. Stat. § 15.37 with Wis. Const, art. X, Section 1. Therefore, supervision of DPI rulemaking is a statutory power of the Superintendent, not a constitutional power.
¶ 222. Second, the legislature has the constitutional power to control the mechanism by which rulemaking is undertaken because rulemaking is a delegation of the legislature's legislative power granted in Article IV, Section 1. Without legislation, DPI would not exist and could not engage in rulemak-ing. Martinez, 165 Wis. 2d at 698 (explaining that an agency "has no inherent constitutional authority to make rules, and, furthermore, its rule-making powers can be repealed by the legislature").
¶ 223. A review of the evolution of DPI rulemak-ing is helpful. Initially, DPI rulemaking was directed by the educational approval board, not by the Superintendent. Wis. Stat. § 15.03 (1967). The legislature subsequently modified DPI rulemaking, granting more power over rulemaking to the Superintendent. In the statutes now under examination, the legislature again has modified DPI rulemaking by inserting procedural safeguards for the Superintendent and the Governor to oversee. This is similar to what the legislature did in Martinez when it inserted safeguards for JCRAR to oversee with regard to DILHR's rulemaking. Simply because Act 21 affects rulemaking of DPI (and many, many other agencies), it does not follow that the legislature's constitutional powers to control its own rulemaking delegations have been diminished. Id. at 701.
¶ 224. Furthermore, while statutes may create opportunities and obligations for the Superintendent, *549 those opportunities and obligations come from the legislature not from the Constitution. Therefore, legislative modification of the powers and duties of the Superintendent in DPI rulemaking are within the legislature's constitutional authority.
¶ 225. In regard to the interaction of the Superintendent and the legislature, Article X, Section 1 grants the legislature the right to exercise control over duties that relate to education that the Superintendent must undertake. The legislature has broad constitutional power over the Superintendent, so long as the duties assigned do not fall outside of public instruction, as it was alleged to have occurred in School District No. 3, supra. No challenge in this regard has been raised with regard to Wis. Stat. § 227.135(2) and Wis. Stat. § 227.185.
¶ 226. Furthermore, simply because the legislature creates an opportunity or an obligation for the Superintendent, it does not follow that those opportunities and obligations are of constitutional magnitude. However, the lead opinion has conflated the Superintendent's constitutional executive authority to supervise public instruction with his statutory authority to supervise DPI, which later type of supervision is not of constitutional dimension.
¶ 227. In addition, my decision is consistent with Thompson. Thompson was concerned with "other officers" mentioned in Article X, Section 1, one of which was to be Secretary of Education, and whether their authority was inferior to that of the Superintendent. Thompson, 199 Wis. 2d at 683-84. The matter before us does not concern the "other officers" mentioned in Article X, Section 1.
¶ 228. In Thompson, we did not examine whether duties of the Superintendent that had been *550 required by legislation could subsequently be modified by the legislature.[9] Thompson was not concerned with rulemaking; therefore, we did not consider the constitutional power of the legislature when it delegates rulemaking authority, as I have done here.
¶ 229. However, without recognizing the effect of its decision, the lead opinion increases the executive power granted to the Superintendent in Article X, Section 1 to include the power to legislate, which the Constitution clearly reserves to the legislature; treats the DPI as though it has constitutional power; and reduces the constitutional power of the legislature to control its delegations of legislative power in rulemak-ing, all in contravention of Article IV, Section 1 and Article X, Section 1. However, courts are not free to change constitutional delegations, and Article X, Section 1 explicitly states how the constitutional delegations to the legislature and to the Superintendent are to coexist.
D. Constitutional Violation
¶ 230. Finally, in order to succeed before us, the Superintendent must prove beyond a reasonable doubt that Wis. Stat. § 227.135(2) or Wis. Stat. § 227.185 was unconstitutionally enforced against him. Society Ins. v. LIRC, 2010 WI 68, ¶ 27, 326 Wis. 2d 444, 786 N.W.2d 385. In examining the constitutionality of the challenged statutes, the phrase "beyond a reasonable doubt" expresses the "force or conviction" with which we must conclude, as a matter of law, that a statute *551 has been enforced unconstitutionally against the Superintendent. See League of Women Voters of Wis. Educ. Network, Inc. v. Walker, 2014 WI 97, ¶ 17, 357 Wis. 2d 360, 851 N.W.2d 302.
¶ 231. No proof has been submitted that either Wis. Stat. § 227.235(2) or Wis. Stat. § 227.185 has been unconstitutionally enforced against the Superintendent. First, in order for either statute to be unconstitutional as applied, enforcement of § 227.235(2) or § 227.185 must adversely affect a constitutional power of the Superintendent. However, Act 21's administrative rulemaking safeguards impose conditions on only the Superintendent's statutory powers, not on his constitutional authority. There has been no proof that either § 227.235(2) or § 227.185 interferes with the Superintendent's executive authority to supervise existing rules and laws affecting public instruction.
¶ 232. Second, the Superintendent concedes that the legislature could take away all rulemaking power from the Superintendent because rulemaking is a legislative delegation of authority.[10] This concession belies the Superintendent's assertion that rulemaking is constitutionally granted supervision of public instruction. Furthermore, when rulemaking was introduced to DPI in 1967, the "educational approval board" exercised "powers, duties and functions prescribed by law, including rule-making," which actions were set out independently from the executive functions reserved to the Superintendent. Wis. Stat. § 15.03 (1967) (emphasis added). In addition, members of the "educational approval board" were appointed by the Gover *552 nor.[11] Accordingly, I conclude that the Superintendent has failed to meet his burden of proof; and therefore, his constitutional challenge before us fails.
III. CONCLUSION
¶ 233. I conclude that the legislature acted pursuant to its constitutional authority under Article IV, Section 1 and Article X, Section 1 of the Wisconsin Constitution when it enacted Act 21, which creates procedural safeguards to be employed in rulemaking by DPI and many other administrative agencies. I also conclude that Act 21 does not conflict with Thompson. And finally, I conclude that the plaintiffs have not proved beyond a reasonable doubt that Act 21 has been applied unconstitutionally to the Superintendent. Accordingly, I would reverse the decision of the court of appeals and I respectfully dissent from the lead opinion.
¶ 234. I am authorized to state that Justices ANNETTE KINGSLAND ZIEGLER and REBECCA G. BRADLEY join this dissent.

 All further references to the Wisconsin Statutes are to the 2013-14 version unless otherwise indicated.

 Lead op., ¶¶ 4, 57, 63.

 The complaint also objected to the enactment of Wis. Stat. § 227.137(6), which together with § 227.137(2) and the *532 repeal of Wis. Stat. § 227.137(1), imposes an obligation on DPI to provide an economic impact statement for programs that are expected to exceed $20,000,000. Before us, it has not been argued that this requirement is unconstitutional as applied to the Superintendent.

 For convenience, hereinafter, I refer to plaintiffs and the Superintendent of Public Instruction as "the Superintendent."

 "There is created a department of public instruction under the direction and supervision of the state superintendent." Wis. Stat. § 15.37 (1967).

 The educational approval board is no longer involved with DPI, as it was in 1967.

 Wisconsin Stat. § 227.185 provides:
After a proposed rule is in final draft form, the agency shall submit the proposed rule to the governor for approval. The governor, in his or her discretion, may approve or reject the proposed rule. If the governor approves a proposed rule, the governor shall provide the agency with a written notice of that approval. No proposed rule may be submitted to the legislature for review under s. 227.19(2) unless the governor has approved the proposed rule in writing.

 Lead op., ¶¶ 59-62.

 In Thompson, we left open "the extent to which the [Superintendent's] powers may be reduced by the legislature, and we reserve[ed] judgment on that issue." Thompson v. Craney, 199 Wis. 2d 674, 700, 546 N.W.2d 123 (1996).

 Coyne Brief at 15, 23.

 The involvement of the Governor in education in the 1967 statute is consistent with the first legislation passed after Wisconsin's Constitution was ratified in 1848, where some of the duties of the Superintendent were described specifically and some generally as, "such other duties as the legislature or governor of this state may direct." § 3, Laws of 1848, at 129 (emphasis added).